RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

**18-3680 & 18-3909**

ISLAND CREEK COAL COMPANY,

*Petitioner*,

*v.*

MELYNDIA BRYAN, Survivor of Bert F. Bryan; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Respondents.

**18-4022**

DORRIS E. CUNNINGHAM,

*Petitioner*,

*v.*

ISLAND CREEK COAL COMPANY; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

*Respondents*.

Nos. 18-3680/3909/4022

On Petitions for Review of Orders
of the Benefits Review Board, United States Department of Labor;
Nos. 17-0277 BLA; 17-0457 BLA.

Argued: June 18, 2019

Decided and Filed: September 11, 2019

Before: McKEAGUE, THAPAR, and MURPHY, Circuit Judges.

---

**COUNSEL**

**18-3680 & 18-3909**

**ARGUED:** Jeffrey R. Soukup, JACKSON KELLY, PLLC, Lexington, Kentucky, for Petitioner. Brent Yonts, LAW OFFICE OF YONTS, SHERMAN & DRISKILL, PSC, Greenville, Kentucky, for Respondent Bryan. Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. **ON BRIEF:** Jeffrey R. Soukup, William S. Mattingly, JACKSON KELLY, PLLC, Lexington, Kentucky, for Petitioner. Brent Yonts, LAW OFFICE OF YONTS, SHERMAN & DRISKILL, PSC, Greenville, Kentucky, for Respondent Bryan. Edward Waldman, Rita A. Roppolo, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

**18-4022**

**ARGUED:** Austin P. Vowels, VOWELS LAW PLC, Henderson, Kentucky, for Petitioner. Joseph D. Halbert, SHELTON, BRANHAM & HALBERT, PLLC, Lexington, Kentucky for Respondent Island Creek. Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. **ON BRIEF:** Austin P. Vowels, VOWELS LAW PLC, Henderson, Kentucky, for Petitioner. Joseph D. Halbert, SHELTON, BRANHAM & HALBERT, PLLC, Lexington, Kentucky for Respondent Island Creek. Edward Waldman, Sean G. Bajkowski, Sarah M. Hurley, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

---

**OPINION**

---

MURPHY, Circuit Judge. It has long been said that the doctrine of administrative exhaustion "is as old as federal administrative law." Raoul Berger, *Exhaustion of Administrative Remedies*, 48 Yale L.J. 981, 981 (1939). But what is the doctrine's source? A federal statute? Federal common law? A brooding omnipresence in the bureaucratic sky? This question confronts us in these petitions for review, which assert claims based on *Lucia v. SEC*, 138 S. Ct. 2044 (2018). There, the Court held that the SEC's appointment of an administrative law judge violated the Constitution's Appointments Clause. *Id.* at 2049. Here, the petitioners argue that *Lucia* renders unconstitutional the appointments of the administrative law judges who adjudicated their black-lung-benefits disputes. But there is a catch: The petitioners raised this issue for the first time in motions for reconsideration with the Benefits Review Board, the body

within the Department of Labor that hears appeals from decisions of administrative law judges. The Board held that their constitutional claims came too late, so the Department of Labor asserts that they forfeited this issue in *court* by failing to properly exhaust it with the *agency*. We must consider, among other questions, whether the Black Lung Benefits Act contains a requirement to exhaust issues with the Board and, if so, whether that requirement bars the petitioners' constitutional claims.

I.

The Black Lung Benefits Act, 30 U.S.C. §§ 901–44, "provides federal funds to those who have been totally disabled by pneumoconiosis, a respiratory disease commonly caused by coal mine employment, and to their eligible survivors." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 717 (1990). The Act grants broad authority to the Secretary of Labor to implement its provisions. *E.g.*, 30 U.S.C. § 902(f)(1); *id.* § 932(h). Regulations authorize benefits if miners prove that they have "pneumoconiosis"; that the disease "arose out of coal mine employment"; that they are "totally disabled"; and that their "pneumoconiosis contributes to the total disability." 20 C.F.R. § 725.202(d)(2). Regulations also establish a framework for identifying the coal-mine "operator" who should be on the hook for paying the benefits. *Id.* §§ 725.494–.95; *see* 30 U.S.C. § 932(b).

To resolve benefits disputes between miners and operators, the Act incorporates many claims-processing rules from the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–50. 30 U.S.C. § 932(a). When a miner applies for benefits, a "district director" in the Department of Labor investigates the claim and issues a proposed order granting or denying benefits. 20 C.F.R. § 725.418(a). From that order, a miner or operator may request a hearing before an administrative law judge. 33 U.S.C. § 919(d); 20 C.F.R. § 725.419(a). The judge typically holds a hearing under the Administrative Procedure Act's adjudication rules, 5 U.S.C. § 554, and issues a benefits decision with accompanying findings of fact and conclusions of law. 20 C.F.R. §§ 725.450–.79. Following that decision, the miner or operator may appeal a "substantial question of law or fact" to the Benefits Review Board. 33 U.S.C. § 921(b)(3); 20 C.F.R. § 725.481. After exhausting these internal agency steps, the miner or operator may

lastly obtain judicial review of "a final order of the Board" from a court of appeals. 33 U.S.C. § 921(c); 20 C.F.R. § 725.482(a).

Department of Labor staff (not the Secretary of Labor) had been appointing the administrative law judges who adjudicate benefits disputes within the agency. Yet the Constitution's Appointments Clause dictates the method for appointing "Officers of the United States," allowing Congress to place the appointment power for "inferior Officers" only "in the President," the "Courts of Law," or the "Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Thus, if administrative law judges qualify as "inferior Officers" rather than employees, their staff appointments violated the Constitution. In December 2017, anticipating that the Supreme Court might review this question, the Secretary of Labor ratified the appointments of the existing administrative law judges. Several months later, on June 21, 2018, the Court held that an SEC administrative law judge was an inferior officer who had been unconstitutionally appointed. *Lucia*, 138 S. Ct. at 2055.

This administrative backdrop sets the stage for these two benefits disputes. (We highlight their general facts now and save the details for our later substantial-evidence review.)

*Dorris Cunningham* (No. 18-4022). Petitioner Dorris Cunningham worked at a Kentucky coal mine from 1952 until his 1993 retirement. Respondent Island Creek Coal eventually came to operate the mine. After his retirement, Cunningham applied for black-lung benefits, but his claims were denied because he was not "totally disabled." In February 2014, Cunningham filed his current application. After a district director proposed awarding benefits, Island Creek requested a hearing with an administrative law judge. The judge found that Cunningham again failed to show that he was totally disabled. On June 27, 2018, a few days after *Lucia*, the Benefits Review Board affirmed. In a motion for reconsideration, Cunningham argued for the first time that the Secretary of Labor had not properly appointed the administrative law judge who rejected his claim. The Board denied the motion. It found that Cunningham had "waived" this constitutional issue because he raised it "only after the Board issued its decision on the merits."

*Melyndia Bryan* (Nos. 18-3680, 18-3909).    Bert Bryan worked in underground coal mines for at least 16 years between 1972 and 1989.  He applied for black-lung benefits in July 2010, but died two years later.  His wife, Respondent Melyndia Bryan, assumed his claim and filed a separate survivor's claim.  A district director awarded benefits on both claims and found Island Creek (the Petitioner in Bryan's cases) to be the responsible operator.  Island Creek requested a hearing with an administrative law judge.  The judge found that Bert Bryan had a total disability due to pneumoconiosis, that he had been entitled to benefits from the date of his application to the date of his death, and that Melyndia was entitled to survivor's benefits.  Island Creek appealed both claims to the Benefits Review Board.  In February 2018, the Board affirmed the judge's decision on the original claim, but suggested that Island Creek had not appealed the survivor's claim.  After Island Creek filed a motion for reconsideration, the Board recognized that Island Creek had in fact appealed.  Yet, on June 15, 2018, the Board affirmed the decision on the survivor's claim too.  In another motion for reconsideration after *Lucia*, Island Creek for the first time challenged the appointment of the administrative law judge who awarded benefits. The Board found that Island Creek (like Cunningham) had "waived" this issue by failing to raise it sooner.

From these final orders of the Benefits Review Board, Cunningham and Island Creek sought this court's review, requesting a new hearing before a properly appointed administrative law judge (and raising fact-specific substantial-evidence challenges).  We consolidated their petitions for review.  In this court, the Director of the Office of Workers' Compensation Programs in the Department of Labor (the "Department of Labor") concedes that the administrative law judges who oversaw these disputes were not constitutionally appointed.  But the Department of Labor argues that Island Creek and Cunningham forfeited their constitutional claims by not exhausting them with the agency.

II.

We start with the exhaustion question.  At the outset, we note what this question is *not* about.  To begin with, it does not implicate our subject-matter jurisdiction.  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 822 (6th Cir. 2015).  The law grants the courts of appeals adjudicative authority over "a final order of

the Board," 33 U.S.C. § 921(c), and Island Creek and Cunningham timely petitioned from final orders. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 763–67 (1975). This question also does not implicate what some cases have called the "exhaustion of remedies": a requirement that a party complete the agency's internal remedial steps (including administrative appeals) before turning to the judiciary. *Sims v. Apfel*, 530 U.S. 103, 107 (2000). Island Creek and Cunningham litigated these disputes before an administrative law judge, 33 U.S.C. § 919(d), and appealed the judge's decision to the Benefits Review Board, *id.* § 921(b)(3). The statute required them to invoke no more agency processes before heading to court. *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–09 (1994); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48–51 (1938).

This case instead implicates what cases have called "issue exhaustion." *Sims*, 530 U.S. at 107; 2 Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 17.8 (6th ed. 2019). The Department of Labor argues that Island Creek and Cunningham should have raised a specific *issue* (their Appointments Clause challenge) with the Benefits Review Board in order to preserve that issue for judicial review. We addressed a similar issue-exhaustion claim in *Jones Brothers, Inc. v. Secretary of Labor*, 898 F.3d 669 (6th Cir. 2018), which asked "three interrelated questions" to resolve an agency's argument that a party failed to exhaust a post-*Lucia* constitutional challenge. *Id.* at 673. We ask three similar questions here: (1) Must parties who seek judicial review of the Benefits Review Board's orders exhaust issues with the Board? (2) If so, did Island Creek and Cunningham exhaust their constitutional claims by raising them in motions for reconsideration? (3) If not, do these constitutional claims nevertheless fall within an exception to the exhaustion requirement? We conclude: Yes, No, and No. Our reasons follow.

1. *Does this administrative scheme contain an issue-exhaustion requirement?*

This question, the Department of Labor assures us, has an obvious answer: "Under longstanding principles of administrative law, a party may not raise before the court an argument it failed to preserve before the agency." The Department's categorical claim suggests that courts have the power to impose a universal exhaustion requirement across all federal statutes in common-law fashion. Admittedly, language in the caselaw could be read to support that notion. Courts have described an implied requirement to raise issues with an agency as a "judge-made,"

"prudential," or "common law" duty to exhaust. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *Hettinga v. United States*, 560 F.3d 498, 503 (D.C. Cir. 2009); Hickman & Pierce, *supra*, § 17.2, at 1457. And the Supreme Court has noted that this implied exhaustion requirement can arise from "judicial discretion." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992).

On closer inspection, though, the Department of Labor's generic framing—unconnected, as it is, to any specific statute—overstates things. Just as the "common law is not a brooding omnipresence in the sky," *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting), so too administrative law is not a hazy body of policy choices that courts are free to "discover." *See Patsy v. Bd. of Regents*, 457 U.S. 496, 501–02 (1982); John F. Duffy, *Administrative Common Law in Judicial Review*, 77 Tex. L. Rev. 113, 120 (1998). Instead, exhaustion primarily raises a question of statutory interpretation about "the particular administrative scheme at issue." *Salfi*, 422 U.S. at 765; *Darby v. Cisneros*, 509 U.S. 137, 144–45 (1993); *Patsy*, 457 U.S. at 501–02 & n.4. And, as with any interpretive question, courts must adopt exhaustion rules that comport "with congressional intent and any applicable statutory scheme." *McCarthy*, 503 U.S. at 144. In that respect, the Supreme Court has identified three categories of statutory schemes when deciding if a specific statute contains an issue-exhaustion mandate. *Sims*, 530 U.S. at 107–10.

Category One: Many issue-exhaustion requirements are pure "creatures of statute." *Id.* at 107. Consider the Mine Act addressed in *Jones Brothers*. 898 F.3d at 672–73. That statute tells courts: "No objection that has not been urged before the [Federal Mine Safety and Health Review] Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 30 U.S.C. § 816(a)(1). An issue-exhaustion mandate (with a built-in exception) could not be stated in plainer terms. Many statutes fit the same mold. *E.g.*, 15 U.S.C. § 77i(a); 29 U.S.C. § 160(e); 47 U.S.C. § 405(a); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36 n.6 (1952). Others are written in more general terms, requiring "administrative remedies" to be "exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has read this text to command "proper" exhaustion, which may include issue exhaustion if an agency's rules so require. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006); *cf. Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 155 n.15 (1946).

Category Two: Some statutes say nothing about exhaustion, but permit agencies to adopt regulations detailing their internal claims-processing rules.  In these regimes, "it is common for an agency's regulations to require issue exhaustion in administrative appeals." *Sims*, 530 U.S. at 108.  This type of regulation must comport with the statute under which it arose.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156–57 (2013); *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 349 (4th Cir. 2001).  And the agency must not misinterpret the regulation or apply it in an arbitrary manner (by, for example, enforcing it against some parties but not others).  *See Crockett Colleries, Inc. v. Barrett*, 478 F.3d 350, 353–55 (6th Cir. 2007); *compare Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1151 (D.C. Cir. 1988) (per curiam), *with Brown v. Nat'l Transp. Safety Bd.*, 795 F.2d 576, 578–79 (6th Cir. 1986) (per curiam).  But when an issue-exhaustion regulation is valid, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." *Sims*, 530 U.S. at 108; *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255 (Fed. Cir. 2015); *Vt. Dep't of Pub. Serv. v. United States*, 684 F.3d 149, 156–58 (D.C. Cir. 2012).  That is because courts usually must enforce claims-processing rules when a party properly invokes them.  *Union Pac. R.R. Co. v. Locomotive Eng'rs*, 558 U.S. 67, 81 (2009).

Category Three: When neither statute nor regulation says anything about exhaustion, the Supreme Court has held that a court may still impose an *implied* exhaustion rule as long as the rule comports with the statutory scheme.  *Sims*, 530 U.S. at 108–10 (discussing *L.A. Tucker Truck Lines*, 344 U.S. at 36–37).  The Court, however, has yet to identify the *source* of the judiciary's authority to impose this "prudential" exhaustion mandate on top of a statutory scheme that does not expressly contain one.  *See In re Univ. of Mich.*, __ F.3d __, No. 19-1636, 2019 WL 3979607, at *2 (6th Cir. Aug. 23, 2019).  We see two potential views of this prudential-exhaustion category—one that places it on firmer ground, the other that leaves it with shaky foundations.

Under the first view, prudential exhaustion may have roots in general constitutional or statutory text.  To begin with, perhaps as a "rule of judicial administration," *Myers*, 303 U.S. at 50, it has a *constitutional* source.  Article III's "judicial Power" gives courts "certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the

orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citation omitted). And the Supreme Court has compared prudential exhaustion to the longstanding rule that an appellate court will not consider issues that were not raised in district court. *Sims*, 530 U.S. at 108–09 (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)). The courts' inherent authority likely allows them to adopt that "long unquestioned" forfeiture rule, *see Carlisle v. United States*, 517 U.S. 416, 426 (1996) (citation omitted), which dates to the writs of error from English common law. *See* Robert J. Martineau, *Considering New Issues on Appeal*, 40 Vand. L. Rev. 1023, 1026–28 (1987); Roscoe Pound, *Appellate Procedure in Civil Cases* 107–10, 133 (1941). Here, then, the key question would ask whether any inherent authority to adopt forfeiture rules *within* the courts is broad enough to cover a rule requiring parties to exhaust issues in an agency *before* reaching the courts. *Cf. Degen v. United States*, 517 U.S. 820, 823–29 (1996).

If prudential exhaustion has these constitutional origins, it would raise other questions. Is this judicial authority to adopt forfeiture rules "indefeasible" such that Congress may not intrude on it? *Chambers v. NASCO, Inc.*, 501 U.S. 32, 58 (1991) (Scalia, J., dissenting). Or may it "be controlled or overridden by statute or rule"? *Degen*, 517 U.S. at 823; *see Carlisle*, 517 U.S. at 426–28. Congress has long acted on the latter view, as evidenced by the many statutes dictating when courts may consider issues not raised with an agency. Hickman & Pierce, *supra*, § 17.8, at 1534. If Congress is correct, prudential exhaustion might be thought of as a "background principle" against which Congress legislates, like federalism or equitable tolling. *Bond v. United States*, 572 U.S. 844, 857–58 (2014); *Young v. United States*, 535 U.S. 43, 49–50 (2002). Courts would retain an inherent authority to adopt exhaustion rules so long as a statute does not clearly say otherwise. *Cf. Link v. Wabash R.R. Co.*, 370 U.S. 626, 631–32 (1962).

Aside from the Constitution, maybe prudential exhaustion has a general *statutory* source, one tied to the remedy sought—vacatur of an agency order. If that relief can be characterized as "equitable," a statute might be read to give courts discretion over whether to grant it (just as courts have discretion over whether to grant injunctions). *Cf. Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 332–33 (1976) (per curiam); *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939). Indeed, the exhaustion "doctrine had its origin in a discretionary rule

adopted by courts of equity to the effect that a petitioner will be denied equitable relief when he has failed to pursue an available administrative remedy by which he might obtain the same relief." *Smith v. United States*, 199 F.2d 377, 381 (1st Cir. 1952). That said, the Supreme Court long ago suggested that prudential exhaustion applies outside equity cases. *See Myers*, 303 U.S. at 51 n.9.

The second view of prudential exhaustion, by contrast, places it in a far different light. As one scholar has suggested, Duffy, 77 Tex. L. Rev. at 152–54, it may be a relic of the "*ancien regime*" of statutory interpretation in which federal courts, acting like common-law courts, imposed judicial glosses on legislative texts to make statutes work "better." *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). Two doctrines exemplified this old regime. Under the doctrine of implied rights of action, the Supreme Court once added private causes of action to statutes whenever it decided that private suits would better promote statutory goals. *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964). Likewise, under the doctrine of prudential standing, the Court once applied judicial "limits" on legislative causes of action whenever it found that a party should not be able to assert the right to sue. *See Allen v. Wright*, 468 U.S. 737, 751 (1984). In recent years, however, the Court has rejected these atextual approaches. Nowadays, when a statute's text and structure do not establish a private cause of action, courts "may not create one, no matter how desirable that might be as a policy matter." *Alexander*, 532 U.S. at 286–87. And when a statute's text and structure do not restrict a private cause of action, courts "cannot limit [the] cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

Prudential exhaustion bears some resemblance to these now-disfavored doctrines. It rests less on a statute's text and structure, and more on policy grounds unmoored from those sources. The Supreme Court has justified it on such objectives as avoiding "interruption" of agency autonomy, *McKart v. United States*, 395 U.S. 185, 194–95 (1969), and promoting "judicial efficiency," *McCarthy*, 503 U.S. at 145. Perhaps these are good policies, but what gives courts the authority to impose them? Not only that, the many statutes that contain exhaustion rules prove that Congress knows how to write them. Some might read this disparate inclusion and exclusion as an intentional legislative choice. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S.

83, 88–92 (1991), *superseded by statute as recognized by L & W Supply Corp. v. Acuity*, 475 F.3d 737, 740 (6th Cir. 2007); *Russello v. United States*, 464 U.S. 16, 23 (1983). Prudential exhaustion also sits uncomfortably next to the traditional rule that courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). Chief Justice Marshall did not add the disclaimer: except courts may refuse to hear an issue if they think it makes sense to demur under a balancing test that juggles the interests of the plaintiff, the agency, and the court. *But see McCarthy*, 503 U.S. at 146. If this view of prudential exhaustion prevails, it may (and perhaps should) go the way of other atextual doctrines. *See* Duffy, 77 Tex. L. Rev. at 152; *cf.* Philip Hamburger, *Is Administrative Law Unlawful?* 304 n.d (2014).

In short, the Supreme Court may someday have a choice to make—either align prudential exhaustion with the Court's modern textualist approach or distance itself from that exhaustion category.

Thankfully for us, this is not the case to make the choice. We need not rely on our "prudence" to conclude that the Black Lung Benefits Act requires exhaustion. *Lexmark*, 572 U.S. at 128. To be sure, the case for exhaustion here is harder than it was in *Jones Brothers*. Unlike the Mine Act, the Black Lung Benefits Act contains no statutory text directing parties to raise issues with the Benefits Review Board. 33 U.S.C. § 921(c). But a regulation (not our discretion) bridges this gap by requiring parties to file petitions for review identifying "specific issues to be considered" by the Board. 20 C.F.R. § 802.211(a). This case thus falls into the second exhaustion category. Indeed, the Supreme Court highlighted this specific regulation when noting that agencies may impose exhaustion mandates through their rulemaking. *Sims*, 530 U.S. at 108.

Nor do Island Creek or Cunningham argue that this regulation conflicts with the Black Lung Benefits Act or the Longshore and Harbor Workers' Compensation Act (whose claims-processing rules it incorporates). As a general matter, both laws give the Department of Labor the authority to issue regulations to carry out their provisions. 30 U.S.C. § 936(a); 33 U.S.C. § 939(a). As a specific matter, our court has recognized a reason—one rooted in the statutory text—to require parties to identify specific issues with the Board. *See Cox v. Benefits Review*

*Bd.*, 791 F.2d 445, 446–47 (6th Cir. 1986) (per curiam). The statute does not give parties the right to a "do over" with the Board; it instead circumscribes the Board's review. The Board may decide only "substantial question[s] of law or fact"; it must limit its review to the "hearing record"; and it must defer to the administrative law judge's fact-findings if supported by "substantial evidence." 33 U.S.C. § 921(b)(3); 20 C.F.R. § 802.301(a)–(b). By requiring parties to highlight specific errors, the regulation implements these statutory limits on the Board's review. *Cox*, 791 F.2d at 446–47. And courts of appeals have jurisdiction to review only orders of the Board, not of administrative law judges. 33 U.S.C. § 921(c). If a party flouts the regulation by failing to raise with the Board an issue that the party asserts in court, the court generally has no basis for "setting aside" the *Board's* order (even assuming the *administrative law judge* erred). *Id.*

Unsurprisingly, then, our decades-long precedent has refused to consider issues that parties failed to present to the Board. *See Island Fork Constr. v. Bowling*, 872 F.3d 754, 758 (6th Cir. 2017); *Premium Coal Co. v. Dir., Office of Workers' Comp. Programs*, 619 F. App'x 447, 450 (6th Cir. 2015); *Brandywine Explosives & Supply v. Dir., Office of Workers' Comp. Programs*, 790 F.3d 657, 663–64 (6th Cir. 2015); *Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 602 (6th Cir. 2014); *Ramey v. Ky. Carbon Corp.*, No. 95-3204, 1996 WL 221415, at *5 (6th Cir. May 1, 1996) (per curiam); *Hix v. Dir., Office of Workers' Comp. Programs*, 824 F.2d 526, 527–28 (6th Cir. 1987); *Buckner v. Benefits Review Bd.*, No. 86-3461, 1987 WL 37753, at *2 (6th Cir. June 19, 1987) (per curiam); *Honaker v. Benefits Review Bd.*, No. 85-3960, 1986 WL 18101, at *1–2 (6th Cir. Oct. 20, 1986) (per curiam); *Cox*, 791 F.2d at 447; *Blevins v. Dir., Office of Workers' Comp. Programs*, 683 F.2d 139, 142–43 (6th Cir. 1982); *cf. Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1119 (6th Cir. 1984). We reaffirm this issue-exhaustion requirement in this case.

### 2. *Did a motion for reconsideration suffice to exhaust the constitutional issue?*

We next consider whether Island Creek and Cunningham satisfied this exhaustion rule by raising their constitutional claims in motions for reconsideration with the Board. Cases applying prudential and statutory exhaustion alike identify a simple principle for determining what parties must do to exhaust an issue: follow the agency's rules governing how to assert the issue with the

agency. The Supreme Court has said, for example, that prudential exhaustion requires a party to raise an issue with an agency "at the time appropriate under its practice" in order to preserve the issue for judicial review. *L.A. Tucker Truck Lines*, 344 U.S. at 37. And when interpreting a statute requiring exhaustion, the Court likewise held that a party need only "complete the administrative review process in accordance with the applicable [agency's] procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88).

Two regulations concerning the Benefits Review Board illustrate this principle. One regulation requires parties to file appeals with the Board within 30 days from an administrative law judge's decision. 20 C.F.R. § 802.205(a). When the Board dismissed an untimely appeal, we held that the party failed to exhaust any merits issues for judicial review by disregarding the agency's timelines. *Blevins*, 683 F.2d at 142–43. Another regulation, as noted, requires petitions for review to contain "the specific issues to be considered" by the Board. 20 C.F.R. § 802.211(a). When the Board affirmed an administrative law judge's decision because a generic petition for review did not list specific issues, we held that the party "failed to properly exhaust her administrative remedies and preserve the merits of this appeal for review." *Cox*, 791 F.2d at 447. In short, if the Board does not consider a merits issue because a party failed to follow the Board's procedural rules, the party generally has not exhausted that issue for a court's review.

This reasoning points us to the right question here: Do the Department of Labor's claims-processing rules permit a party to raise a new constitutional issue in a motion for reconsideration with the Benefits Review Board? They do not. A regulation does permit parties to file motions for reconsideration explaining the "supporting rationale for the request." 20 C.F.R. § 802.408(a). Yet, as in this case, the Board has long interpreted this regulation to bar parties from raising new arguments "for the first time in a motion for reconsideration." *Parks v. Navy Personnel Command/MWR*, No. 04-0179, 2006 WL 6869771, at *7 (Ben. Rev. Bd. Feb. 3, 2006); *Ravalli v. Pasha Mar. Servs.*, No. 01-0572, 36 Ben. Rev. Bd. Serv. 91 (Sept. 12, 2002).

Island Creek and Cunningham do not claim that the Board's interpretation—barring parties from raising new issues on reconsideration—misreads the regulation or is otherwise arbitrary or capricious. *Cf. Crockett Colleries*, 478 F.3d at 353–55. Nor could they. After all,

they sought *consideration* (not *re*consideration) of this constitutional issue.  And appellate courts have long interpreted analogous rules as prohibiting parties from raising new issues at the rehearing stage.  *See Costo v. United States*, 922 F.2d 302, 302–03 (6th Cir. 1990) (order); *see also Easley v. Reuss*, 532 F.3d 592, 593–94 (7th Cir. 2008) (per curiam) (citing cases); *cf. SSA Terminals, LLC v. Bell*, 653 F. App'x 528, 532 (9th Cir. 2016).  Island Creek and Cunningham also do not challenge the Board's application of this rule to their cases.  They do not argue, for example, that the Board has applied its interpretation inconsistently.  *Cf. Hooper*, 841 F.2d at 1151.  They thus give us no grounds for overlooking the Board's procedural requirements, which means they failed to exhaust their constitutional claims before the Department of Labor.

### 3. *Does any exception to this exhaustion mandate apply?*

We lastly ask whether any exception to the exhaustion mandate saves the constitutional claims.  When it comes to exceptions, a sharp divide separates statutory from prudential exhaustion.  For exhaustion rules that originate with a clear *statutory command*, courts have "refus[ed] to add unwritten" exceptions on top of those in the text itself.  *Ross*, 136 S. Ct. at 1857.  For exhaustion rules that originate with *judicial prudence*, courts have felt free to adopt "judge-made exceptions" in the same prudential fashion.  *Id.*  In that setting, courts have developed several standard exceptions, including a "futility" exception for parties who assert claims that an agency cannot consider, *see McCarthy*, 503 U.S. at 147–49, and a "hardship" exception for parties who face undue harm from agency exhaustion, *see McKart*, 395 U.S. at 197.

In between a rigorous statutory mandate and a purely prudential one, other regulatory regimes establish nuanced rules that turn on the proper reading of a statutory or regulatory text.  *Ross*, 136 S. Ct. at 1858 n.2.  At times, exhaustion language "might be best read to give judges leeway to create exceptions or to itself incorporate standard administrative-law exceptions."  *Id.*; *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681–83 (D.C. Cir. 1983).  Our reading of the Mine Act in *Jones Brothers* proves this point.  That act, as noted, bars courts from considering objections that were not raised before the Federal Mine Safety and Health Review Commission except in "extraordinary circumstances."  30 U.S.C. § 816(a)(1).  Yet *Jones Brothers* read the act as barring the Commission from reviewing "facial constitutional

challenges." 898 F.3d at 674. Putting the act's moving pieces together, we held, it should be interpreted to exclude these facial challenges (which the Commission could not consider) from its requirement to raise issues with the Commission. *Id.* at 673–74. But, we added, the Mine Act does require parties to exhaust as-applied or constitutional-avoidance claims because the Commission may address those narrower arguments. *Id.* at 674–77.

Here, then, we must ask whether the regulation ordering parties to identify "specific issues" with the Benefits Review Board, 20 C.F.R. § 802.211(a), is best read to grant "courts some discretion to" overlook a failure to follow it. *Wash. Ass'n for Television*, 712 F.2d at 681. We have already suggested (implicitly) that it permits excuses by applying the "futility" exception in this context. *See Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 904 (6th Cir. 1996). But we need not decide what exceptions (if any) exist. Even if the regulation includes some, Island Creek and Cunningham have not shown that their claims would fall within one.

They both rely on *Jones Brothers* to identify exceptions, so we start with that decision. It held that a constitutional challenge to the appointment of an administrative law judge did not fall within its exception for *facial* constitutional claims. 898 F.3d at 676–77. That was so because the Mine Act allowed the Commission (the "Head of Department" under the Appointments Clause) to appoint administrative law judges "as it deems necessary." 30 U.S.C. § 823(b)(2). The petitioner challenged only the way that the Commission had *applied* the statute (delegating appointments to staff); the petitioner did not challenge a statute that, say, ordered judges to be appointed in a manner that flouts the Constitution. *Jones Bros.*, 898 F.3d at 676–77. The Commission thus had the power to fix this problem simply by reading the statute to require it to make appointments itself. *Id.* at 677. And because the petitioner's constitutional claim asserted an as-applied challenge, it should have raised the claim with the Commission. *Id.* At the same time, we held that the petitioner qualified for the Mine Act's *statutory* "extraordinary circumstances" exception. 30 U.S.C. § 816(a)(1). We did so because of "the absence of legal authority addressing whether the Commission could entertain" this type of as-applied claim. *Jones Bros.*, 898 F.3d at 677.

Island Creek relies on *Jones Brothers*' exception for facial constitutional challenges, whereas Cunningham asserts its extraordinary-circumstances exception. Neither applies.

*Facial Challenge*.   Distinguishing the as-applied claim in *Jones Brothers*, Island Creek argues that its constitutional claim raises a facial challenge.   This argument has two problems.

Problem One: Unlike the Commission in *Jones Brothers*, the Benefits Review Board may well be able to consider facial claims—a fact that would eliminate this exception's raison d'être. The Board serves the same functions that district courts performed before its 1972 creation— reviewing benefits decisions made by agency officials (deputy commissioners before 1972, administrative law judges thereafter).   *Gibas*, 748 F.2d at 1116.   Thus, "it appears that Congress intended to vest in the Board the same judicial power to rule on substantive legal questions as was possessed by the district courts."   *Id.* at 1118.   District courts, of course, may consider facial claims, *Marbury v. Madison*, 5 U.S. 137, 177–78 (1803), so the Board has long asserted "that it possesses sufficient statutory authority to decide . . . the constitutional validity of statutes and regulations within its jurisdiction," *Duck v. Fluid Crane & Constr. Co.*, No. 02-0335, 2002 WL 32069335, at *2 n.4 (Ben. Rev. Bd. Oct. 22, 2002).   This should be unsurprising.   The executive branch has just as much of an obligation to comply with the Constitution when enforcing the law as the judicial branch does when interpreting it (and, for that matter, the legislative branch does when enacting it).   *See* Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905 (1990); *cf.* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018).

Problem Two: We need not resolve whether the Board may consider facial challenges because Island Creek does not, in fact, present one.   There is something conspicuously missing from its facial challenge: a *statute* that would be rendered unconstitutional if the administrative law judges were unconstitutionally appointed.   A critical ingredient of any facial constitutional challenge to a statute is a statute.   Instead, the claim here concerns how the Department of Labor *applied* its statutory appointment power.   *See* 33 U.S.C. § 919(d); 5 U.S.C. § 3105.   Proving this point, the Secretary of Labor himself ratified the appointments of the existing administrative law judges in December 2017 (months before *Lucia*) without any evident statutory obstacle.   This as-applied claim is thus like the as-applied claim in *Jones Brothers*.   *See* 898 F.3d at 676–77.

To be sure, Island Creek does identify a *factual* distinction between this case and *Jones Brothers*.   The Commission that would have considered the constitutional claim there was also the "Head of Department" under the Appointments Clause, and so would be the entity to cure

any constitutional problem by making proper appointments.  Here, by contrast, the Board (which would consider the constitutional claim) is not the Head of Department; the Secretary of Labor needed to cure the problem by making proper appointments.  We fail to see why this distinction matters.  The Board had the authority to address this constitutional issue and provide effective relief (a new hearing before a properly appointed judge), as evidenced by the many cases in which it has done just that for parties who preserved their claims.  *E.g.*, *Miller v. Pine Branch Coal Sales, Inc.*, No. 18-0323 BLA, 2018 WL 8269864, at *2–3 (Ben. Rev. Bd. Oct. 22, 2018) (en banc).

*Extraordinary Circumstances*.  Cunningham relies on the "extraordinary circumstances" exception that succeeded in *Jones Brothers*.  His argument contains two similar problems.

Problem One: *Jones Brothers*' "extraordinary circumstances" exception originates with the Mine Act's *statutory text*.  Neither the Black Lung Benefits Act nor its implementing regulations contain similar language.  And Cunningham points to no caselaw identifying a well-established administrative exception for "extraordinary circumstances."  *Cf. Woodford*, 548 U.S. at 103 (Breyer, J., concurring in the judgment).  So it is not clear that this exception exists either.

Problem Two: Regardless, Cunningham identifies no extraordinary circumstances.  A critical difference exists between the Mine Act in *Jones Brothers* and the Black Lung Benefits Act in this case.  *Jones Brothers* recognized "the absence of legal authority" over whether the Commission could address this as-applied claim.  898 F.3d at 677.  Here, abundant authority— including decisions from our court and from the Board—showed that the Board could hear the claim.  *See Gibas*, 748 F.2d at 1118; *Duck*, 2002 WL 32069335, at *2 n.4.  Thus, the absence of authority that *Jones Brothers* found extraordinary is itself absent here.

Cunningham next turns to *Lucia*, which issued after he filed his brief with the Board.  He argues that this decision departed from preexisting law and so qualifies as an "exceptional circumstance" for his failure to raise the claim earlier.  We have already rejected this argument when a party raised the same constitutional challenge for the first time in a reply brief in court.  *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018).  As we said there, many

litigants had been "press[ing] the issue before *Lucia*," and "*Lucia* itself noted that existing case law 'says everything necessary to decide this case.'" *Id.* (citation omitted).

Cunningham lastly points to *Freytag v. Commissioner*, 501 U.S. 868 (1991). It considered an Appointments Clause challenge to the appointment of a special trial judge within the Internal Revenue Service even though the petitioners had not objected to the judge's appointment with the agency (and, indeed, had consented to the judge's adjudication of the trial). *See id.* at 871–73. Yet *Freytag* treated the exhaustion mandate in that tax context as arising on purely prudential grounds, which allowed it to adopt any purely prudential exception that it felt proper. *Id.* at 878–79; *Hormel*, 312 U.S. at 555–59. Courts also have not read *Freytag*'s exception broadly and have regularly declined to consider unexhausted Appointments Clause challenges like the challenges here. *See Jones Bros.*, 898 F.3d at 678 (citing cases); *cf. Wilkerson*, 910 F.3d at 256.

\* \* \*

To recap: Our cases require parties to exhaust issues with the Benefits Review Board to preserve them in court. By asserting new constitutional claims in motions for reconsideration, Cunningham and Island Creek did not properly exhaust these claims because they did not follow the agency's claims-processing rules governing how to raise them. And the claims fall within no exception to exhaustion. These three points add up to our bottom-line conclusion: Cunningham and Island Creek forfeited their constitutional claims in court by failing to exhaust them with the Board. *Turner Bros., Inc. v. Conley*, 757 F. App'x 697, 699–700 (10th Cir. 2018) (same).

III.

Aside from their constitutional claims, Cunningham and Island Creek raise fact-specific challenges to the Board's decisions affirming the denial of benefits (in Cunningham's case) and affirming the grant of benefits (in Bryan's case). We review the Board's legal conclusions de novo, and, in doing so, we must ensure that the Board applied the deferential "substantial evidence" test to the administrative law judge's fact findings. *See Wilkerson*, 910 F.3d at 257; 33 U.S.C. § 921(b)(3). "'Substantial evidence' means 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985) (per curiam) (citation omitted).

## A. *Dorris Cunningham*

To obtain benefits, Cunningham needed to prove that he was "totally disabled." 20 C.F.R. § 725.202(d)(2)(iii). A regulation defines "total disability" to require "a pulmonary or respiratory impairment which, standing alone, prevents" the miner from performing his usual coal-mine work or comparable work. *Id.* § 718.204(b)(1); 30 U.S.C. § 902(f)(1). It also lists ways to prove total disability. 20 C.F.R. § 718.204(b)(2). Cunningham sought to do so with pulmonary-function tests and medical opinions. *Id.* § 718.204(b)(2)(i), (iv). The administrative law judge rejected both arguments, and the Board affirmed. Cunningham now challenges both aspects of the judge's decision. We reject his arguments. And because the Board correctly held that substantial evidence supported the judge's total-disability conclusion, we do not address Cunningham's other arguments about different elements for obtaining benefits.

1. *Pulmonary-Function Tests*. A miner must meet two requirements to prove total disability through pulmonary-function tests, which measure how well a person's lungs work. *Id.* § 718.204(b)(2)(i). The miner must initially satisfy a metric (not so helpfully) named the "forced expiratory volume in one second" (FEV1) test. The miner's FEV1 results must equal or fall below the relevant "qualifying value" identified in federal regulatory tables that catalogue a range of values for miners of different ages, heights, and sexes. *Id.*; 20 C.F.R. Pt. 718, App'x B. (The "qualifying value" represents 60% of the lung capacity that one would predict from a healthy individual of the miner's age, height, and sex. *See K.J.M. v. Clinchfield Coal Co.*, No. 07-0655 BLA, 2008 WL 2758455, at *4 (Ben. Rev. Bd. June 30, 2008).) Next, the miner must meet one of three other metrics. A miner's results under either the "forced vital capacity" (FVC) test or the "maximum voluntary ventilation" (MVV) test also must equal or fall below the relevant qualifying values in the regulatory tables. Or the miner's tests must satisfy a math problem: the miner's FEV1 result when divided by the miner's FVC result must generate a percentage that is 55% or less. 20 C.F.R. § 718.204(b)(2)(i)(A)–(C).

Here, Cunningham took two pulmonary-function tests (at the ages of 84 and 85). The administrative law judge relied on the regulatory tables' qualifying values for a 71-year-old male who is 66.5 inches tall. To pick the height, the judge averaged the different heights (66 and 67 inches) listed on Cunningham's different tests. To pick the age, the judge used the oldest one (71) listed in the regulatory tables. Cunningham's FEV1 results were lower than the qualifying value for that test, so he met the first regulatory requirement. But he failed the second requirement because his other test results were not at or below the relevant numbers:

|  | Qualifying Values | Cunningham's 3/5/14 Test | Cunningham's 11/20/14 Test | Qualifying? |
|---|---|---|---|---|
| **Age** | 71 | 84 | 85 | -- |
| **Height** | 66.5" | 67" | 66" | -- |
| **FEV1** | 1.60 | 1.54 | 1.40 1.53 | Yes |
| **FVC** | 2.08 | 2.21 | 2.09 2.27 | No |
| **MVV** | 64 | 66 | Missing | No |
| **FEV1/FVC** | 55% | 69.68% | 66.99% 66.96% | No |

*See* 20 C.F.R. Pt. 718, App'x B. Because Cunningham met only one of two requirements, the judge concluded that neither test proved total disability.

Cunningham attacks the judge's conclusion in three ways. *First*, he challenges the decision to use a height of 66.5 inches (the average of the two heights listed on his tests) when choosing the proper "qualifying values" from the regulatory tables. If the judge had used the qualifying values for someone who was 67.3 inches, Cunningham adds, his first test would have met both requirements to prove total disability. But a miner's height is a quintessential fact question subject to substantial-evidence review. And a "reasonable mind" could conclude that Cunningham's height was 66.5 inches given that his tests listed heights that were a little higher and a little lower than the chosen average. *Kolesar*, 760 F.2d at 729 (citation omitted); *see K.J.M.*, 2008 WL 2758455, at *3.

*Second*, Cunningham asks us to "assume that [his] MVV value" for the second test—which was not recorded—"would have been qualifying." But he bears the burden of proving total disability. *See Zurich Am. Ins. Grp. v. Duncan*, 889 F.3d 293, 297 (6th Cir. 2018). A missing MVV result does not do the job.

*Third*, Cunningham says Island Creek stipulated that his tests showed total disability. He relies on a table in the "Stipulated Facts" section of the parties' joint prehearing statement that said the tests had "Qualifying Values." Read narrowly, this "stipulation" identifies a fact that nobody disputes: Both tests showed qualifying values for the FEV1 test. But Cunningham uses the stipulation broadly. He argues that the parties agreed that the tests were qualifying and proved total disability. To the extent the stipulation was ambiguous, the record clarifies that Island Creek did *not* stipulate to that broader proposition. The same prehearing statement listed the question whether "[t]he miner is totally disabled" in its "Disputed Facts" section. And the judge noted at the hearing that one issue she "still ha[d] to decide that the parties still disagree[d] on" was "whether he's totally disabled." Rather than tell her about this supposed stipulation, Cunningham's counsel agreed that total disability remained disputed. Because the parties did not stipulate that the tests showed total disability, we need not address Island Creek's argument that this stipulation would have been an impermissible "legal" one. *See Navistar, Inc. v. Forester*, 767 F.3d 638, 643–44 (6th Cir. 2014).

2. *Medical Opinions*. If a miner cannot prove total disability in other ways, the miner may use medical opinions. 20 C.F.R. § 718.204(b)(2)(iv). In this case, Drs. Sanjay Chavda and Akshay Sood opined that Cunningham was totally disabled, but Dr. Jeffrey Selby opined that he was not. The administrative law judge discredited Chavda's and Sood's opinions, and the Board upheld her findings under substantial-evidence review.

We agree with the Board. A "reasonable mind" who reviewed Dr. Chavda's opinion could discount it (as the judge did) for relying too much on the mistaken view that the pulmonary-function test proved Cunningham's total disability. *Kolesar*, 760 F.2d at 729. Cunningham cites portions of Chavda's opinion allegedly offering reasons other than the test for a total-disability finding. But the portion of Chavda's report *specifically* addressing total disability reasoned that Cunningham's test results fell below the regulatory tables' qualifying

values (using a different height) and "because of that reason" Cunningham had a total disability. That specific analysis provides substantial evidence for the judge's credibility finding.

Similarly, a "reasonable mind" could find (as the judge again did) that Dr. Sood's opinion rested too much on generalities rather than the specifics of Cunningham's case. *Id.* Sood conceded that he did not know Cunningham's lung capacity or the lung capacity necessary for his coal-mine work and that he extrapolated numbers from general studies. While Cunningham provides arguments why Dr. Sood's analysis tied back to his facts, these arguments were for the administrative law judge. Under the deferential standard of review, courts have repeatedly upheld decisions to discredit expert opinions that used generalities. *Island Creek Coal Co. v. Marcum*, 657 F. App'x 370, 379–80 (6th Cir. 2016); *Consolidation Coal Co. v. Dir., Office of Workers' Comp. Programs*, 732 F.3d 723, 735 (7th Cir. 2013). Substantial evidence supported the judge's finding that Dr. Sood's opinion rested on those generalities here.

Cunningham lastly argues that the administrative law judge wrongly ignored his testimony when finding that he was not totally disabled. Not so. The judge's opinion previously recounted Cunningham's description of his breathing problems, and the opinion's later total-disability finding resulted from "weighing all of the evidence as a whole."

## B. *Melyndia Bryan*

The second case involves a role-reversal: Island Creek contests the decision that Melyndia Bryan's late husband (Bert Bryan) was totally disabled due to pneumoconiosis. To reach that conclusion, the administrative law judge invoked the Affordable Care Act. Among its many provisions, that act reintroduced a statutory rebuttable presumption that a miner is totally disabled due to pneumoconiosis if the miner has 15 years of underground coal-mine experience and a totally disabling lung impairment. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1556(a), 124 Stat. 119, 260 (2010) (amending 30 U.S.C. § 921(c)(4)). The judge applied this presumption to Bert, and Island Creek does not dispute this aspect of his decision.

Instead, this case involves the way that a mine operator may rebut the presumption. An operator has two paths. 20 C.F.R. § 718.305(d)(1)(i)–(ii); 30 U.S.C. § 921(c)(4). Under the first path, the operator must show that the miner did not have pneumoconiosis. This path requires the

operator to prove that the miner had neither *clinical* pneumoconiosis (diseases that the medical community recognizes as pneumoconiosis, 20 C.F.R. § 718.201(a)(1)) nor *legal* pneumoconiosis (a broader category of lung impairments that are significantly related to, or substantively aggravated by, coal dust, *id.* § 718.201(a)(2), (b)). *Sunny Ridge Mining Co. v. Keathley*, 773 F.3d 734, 738–39 (6th Cir. 2014). Under the second path, the operator must show that "no part of the miner's respiratory or pulmonary total disability was caused by" pneumoconiosis. 20 C.F.R. § 718.305(d)(1)(ii).

Here, Island Creek disputes the administrative law judge's finding that the company failed to rebut the presumption that Bert had *legal* pneumoconiosis. The parties submitted dueling medical opinions on this point. On Island Creek's side, Drs. Peter Tuteur and Kirk Hippensteel opined that Bert did not have legal pneumoconiosis because his lung impairments were aggravated by his muscle disease and smoking rather than coal dust. On Melyndia Bryan's side, Drs. William Houser and Glen Baker opined that Bert had legal pneumoconiosis. A fifth doctor, Dr. Chavda (the same Dr. Chavda from Cunningham's case) diagnosed legal pneumoconiosis, but was more equivocal when asked to clarify his opinion. To rule against Island Creek, the judge discredited the opinions of Drs. Tuteur and Hippensteel. He decided that these experts failed to adequately explain why Bert's lung impairments were caused by his muscle disease and smoking, not by his coal-dust exposure. And, apart from their opinions, the judge noted that the other experts confirmed (rather than rebutted) that Bert suffered from legal pneumoconiosis.

Before the Benefits Review Board, Island Creek argued that the judge gave invalid reasons to discredit the opinions of Drs. Tuteur and Hippensteel and overlooked that Dr. Chavda's opinion helped rebut the presumption. The Board disagreed, concluding that substantial evidence supported the judge's findings.

We again agree with the Board. Island Creek starts with Dr. Chavda, who stated, when clarifying his opinion, that coal dust may have caused "some aggravation" of Bert's impairment. That statement, Island Creek argues, suggests that coal dust did not *substantially* aggravate his lung impairment (as required by legal pneumoconiosis's definition). *Id.* § 718.201(b). But Dr. Chavda diagnosed Bert as having legal pneumoconiosis. So even assuming his later statement

conflicted with that diagnosis, this inconsistency *itself* provides "substantial evidence" for the judge's finding that Chavda did not help Island Creek rebut the presumption. *See Brandywine Explosives*, 790 F.3d at 668.

Island Creek next disputes the judge's finding that Dr. Tuteur failed to adequately explain why Bert's muscle disease and smoking (rather than coal dust) caused his impairments. The judge reasoned that Tuteur differentiated coal-dust impairments from smoking-related impairments in a way that conflicted with federal regulations noting that the two sources cause similar impairments in similar ways. And the judge asserted that Tuteur's claim that Bert's impairments were "typical" for patients with his muscle disease conflicted with his own analysis that different patients suffer from this disease differently. In response, Island Creek distinguishes the regulations and seeks to reconcile Tuteur's statements about the muscle disease. But these kinds of nitpicks fall well short of meeting Island Creek's burden when attempting to overturn credibility findings in this court. *See Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1073–74 (6th Cir. 2013).

Island Creek lastly challenges the judge's finding that Dr. Hippensteel failed to explain his conclusion that Bert's impairments were not caused by coal dust. Island Creek ignores a separate reason why the judge discredited Dr. Hippensteel. *Cf. Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1061 (6th Cir. 2013). The doctor suggested that a miner's symptoms from coal dust usually subside within a year of ending coal-mine work—an opinion conflicting with regulations recognizing pneumoconiosis as a latent disease that may develop *after* coal-dust exposure ends. 20 C.F.R. 718.201(c). We have repeatedly upheld credibility findings where, as here, an opinion conflicted with these regulations. *Sunny Ridge*, 773 F.3d at 738–39.

* * *

We deny the petitions for review.